UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| TERRY D. BARNES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:11-cv-04040-SLD |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

ORDER

This case involves Plaintiff's application for Social Security disability benefits. The application was denied by Defendant, and Plaintiff sought judicial review. For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment seeking reversal of the Defendant's decision and GRANTS Defendant's Motion for Summary Affirmance.

I. BACKGROUND

On August 4, 2004, Plaintiff Terry D. Barnes ("Barnes") filed an application for Supplemental Security Income ("SSI"), alleging a disability beginning on October 15, 2003. (*See* Social Security Transcript (the "Record," hereafter referred to as "R.") at 16, ECF No. 12.) The claim was denied after initial consideration on January 10, 2005, and again upon review on April 8, 2005. (*Id.*) Barnes filed a request for, and was granted, a hearing before an Administrative Law Judge ("ALJ") on June 15, 2005. (*Id.*) The hearing was held on November 14, 2007. (*Id.*) Barnes was subsequently found to not be disabled in the ALJ's decision of December 17, 2007. (*Id.* at 26.) Barnes requested that this Court review the December 17, 2007, decision, but, upon request of Defendant, the Court remanded the case for further proceedings.

(R. at 435.)  Upon remand, the Appeals Council determined that further evaluation by the ALJ was warranted and referred the case back to the ALJ on July 21, 2009.  (R. at 438.)  Pursuant to the remand, the ALJ held a supplemental hearing regarding Barnes' application on January 19, 2010.  (R. at 515.)  After the supplemental hearing, the ALJ again concluded that Barnes was not disabled because he had not sufficiently demonstrated an inability to perform light or sedentary work.  (R. at 423.)  The Appeals Council declined to review this determination, and Barnes again requested that this Court review the ALJ's decision denying his application for benefits.

## II.  FACTS

### A.  Barnes' Impairments

Barnes was 49 years old at the time of the decision on review and has an eighth grade education.  (R. at 69, 517.)  Barnes has been diagnosed with diabetes, neuropathy of the legs, irritable bowel syndrome ("IBS"), prostatitis, asthma, chronic fatigue, depression, and anxiety.  (R. at 506.)  At the supplemental hearing, Barnes also testified that he is prone to infections and suffers from dizzy spells and headaches.  (R. at 533, 538-39.)  Barnes alleges disability since October 15, 2003.  (R. at 423.)  Barnes does not have health insurance and cannot afford regular medical treatment.  (R. at 557.)

Barnes' most recent job was as a self-employed groundskeeper. He has not worked since 2001.  (R. at 107.)  Barnes testified that he is unable to work due to pain in his legs, IBS, and depression.  (R. at 393.)  In 2008 and 2009, Barnes testified that he attempted to mow his own lawn as many as ten times per year but was unable to continue for more than five minutes at a time.  (R. at 522-23.)  He denied doing any household chores beyond occasionally washing single dishes and watering farm animals.  (R. at 526.)  His wife, Tina Barnes ("Mrs. Barnes"), testified that Barnes sometimes cleans by wiping off countertops and shaking rugs.  (R. at 550.)

However, at the initial hearing in 2007, Barnes conceded that he was able to take his dog on walks. (R. at 400.) Barnes also testified that he is able to prepare a light meal using the stove up to twice a week. (R. at 537.) He has no problems dressing himself or attending to his own hygiene. (R. at 538.)

Barnes generally limits the amount he drives to short distances, due to his IBS and neuropathy. (R. at 530.) Mrs. Barnes has to drive him to visit family members, which she does once or twice a week. (R. at 528.) Barnes will also, on occasion, accompany his wife to shop for groceries. (R. at 526.) At the initial hearing, Barnes testified that he visited casinos up to three times a month to play slot machines. (R. at 402.) At the supplemental hearing, however, Barnes amended that testimony and claimed that he had only been to the casino once in the approximately two years since the initial hearing. (R. at 527.)

### B. Barnes' Medical History

Barnes' medical history includes records from several doctors. Since 1990, Barnes has been treated for his physical complaints by Dr. Artemio Cajigal ("Dr. Cajigal"). (R. at 511.)

In November 2004, Barnes was examined by Dr. Mark DeYoung ("Dr. DeYoung") at the request of the Bureau of Disability Determination Services. (R. at 190.) At that time, Dr. DeYoung found no evidence of neuropathy after performing pin prick, light touch, and monofilament touch tests. (R. at 194.) Thereafter, a Residual Function Capacity ("RFC") assessment was prepared by Dr. Sandra Bilinsky ("Dr. Bilinsky") in December 2004. Dr. Bilinsky's RFC assessment found Barnes capable of performing limited work-related functions. (R. at 228.)

On December 21, 2004, shortly after Dr. Bilinsky's RFC assessment, Barnes was admitted to Trinity Medical Center in Moline, Illinois, following an apparent suicide attempt.

(R. at 237.)  Upon his release, Dr. Eric Ritterhoff ("Dr. Ritterhoff") noted that Barnes "did not show any evidence of classic sadness, hopelessness, withdrawal, or suicidal thinking."  (R. at 237.)  Later, in June 2005, Barnes was seen again by Dr. Ritterhoff, at which time the doctor noted that Barnes asserted "multiple somatic complaints with no obvious relevance or correlation with his medical diagnoses."  (R. at 267.)  Dr. Ritterhoff also noted that Barnes and his wife appeared to be "manipulating [him] for some type of prescription."  (R. 267.)  Then, in May 2006, Barnes received treatment at Bridgeway, Inc., for major depressive disorder and anxiety disorder.  (R. at 364.)

Barnes' mental faculty assessments include a May 2006 Global Assessment of Functioning ("GAF") score of 43 recorded by Dr. Denise Johnson-Dechow ("Dr. Dechow").  (R. at 364.)  Dr. Mohammed Sami ("Dr. Sami"), who indicated that he had been seeing Barnes since July 2007, prepared a mental RFC on October 30, 2007.  (R. at 378.)  Dr. Sami gave Barnes a GAF score in the range of 50 to 54, determined that Barnes would be significantly limited but not precluded from most unskilled work activities, and indicated that Barnes' mental impairments would cause him to miss four or more days of work per month.  (R. at 378, 382.)  At the supplemental hearing, Barnes conceded that he had not received counseling for his mental health problems since at least early 2008 but that he occasionally receives medication through Dr. Cajigal's office.  (R. at 534.)

After the initial decision and remand, Barnes submitted a physical RFC, as well as progress notes, reports, and letters from Dr. Cajigal as additional evidence.  (R. at 497-505.)  On November 7, 2009, Dr. Cajigal wrote a letter certifying his diagnoses of Barnes.  (R. at 506.)  These diagnoses were type 2 diabetes, neuropathy, IBS, depression, asthma, prostatitis, chronic fatigue, and chronic leg pain.  (R. at 506.)  Additionally, Dr. Cajigal completed his RFC

assessment on December 8, 2009.  (R. at 502.)  Dr. Cajigal determined that Barnes could walk one block, sit for 30 minutes, and stand for one hour at a time.  (R. at 499.)  Dr. Cajigal concluded that if Barnes was employed he would need several unscheduled breaks during the day and that he would likely have three absences per month due to his physical impairments.  (R. at 500-02.)  As per the ALJ's request made at the supplemental hearing, Dr. Cajigal submitted a letter on February 16, 2010, outlining his methodology for diagnosing and treating Barnes.  (R. at 511-12.)  In the letter, Dr. Cajigal also described the symptoms experienced by Barnes.  (*Id.*)

### C.  The Remand Decision

On remand from the Court, the Appeals Council ordered the ALJ to engage in "clarification of findings regarding the claimant's mental limitations." (R. at 438.)  Specifically, the ALJ was instructed to "[f]urther evaluate the claimant's mental impairments in accordance with the special techniques described in 20 CFR 416.920a" and document the use of the technique through specific findings and appropriate rationale as well as "[g]ive further consideration to the claimant's maximum residual functional capacity." (R. at 438.)  In doing so, the ALJ was to further develop the record by providing specific references to evidence and the underlying rationale for the conclusions regarding Barnes' mental limitations.  The Appeals Council also instructed the ALJ to, if necessary, obtain evidence from a medical expert to clarify how Barnes' specific mental impairments would translate into work-related limitations and to obtain supplemental evidence from a vocational expert if warranted by the expanded record.  (R. at 439.)

## III.  LEGAL FRAMEWORK

The Court may reverse an ALJ's determination of disability only if the decision is not supported by substantial evidence or relies on a legal error.  *Binion v. Chater*, 108 F.3d 780, 782

(7th Cir. 1997). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must review the record as a whole but cannot substitute its judgment for that of the ALJ "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). Errors of law are not entitled to deference, and an ALJ who commits an error of law must be reversed "without regard to the volume of evidence in support of the factual findings." *Binion*, 108 F.3d at 782. Five requirements must be met for a claimant to be found disabled: (1) the claimant must not be performing substantial gainful activity; (2) the claimant must have a severe, medically determinable impairment; (3) the claimant's impairment must be equal in severity to an impairment listed in 20 C.F.R. Subpart P, Appx. 1; (4) if the claimant does not meet the third test, the claimant must not be able to perform past work activities, and; (5) if the claimant cannot perform past work activities, the claimant must not be able to perform any available jobs existing in the national economy, given the claimant's education, vocational history, and RFC. 20 C.F.R. § 404.1520 (a-f).

## IV.  ANALYSIS

Barnes makes three arguments for reversal of the ALJ's determination. First, Barnes argues that the ALJ erred by failing to give the opinions of his treating physicians controlling weight in analyzing the impact of his impairments on his RFC. Second, Barnes challenges the ALJ's finding that his and his wife's subjective testimony regarding Barnes' physical and mental restrictions lacked credibility. Third, Barnes alleges that the ALJ was required to obtain additional medical expert evidence, or otherwise further develop the record, based on the remand order. The Court addresses each of these arguments in turn.

### A. Weight of Medical Opinion

Barnes argues that the ALJ erred by formulating her own opinion instead of giving controlling weight to the opinions of his treating physicians, Drs. Sami and Cajigal. (Pl.'s Mem. 11-12, 14-15.) A determination of whether an ALJ erred in not giving controlling weight to medical evidence involves a two-part test. First, the Court must determine whether the relationship between the physician and the patient is treating, examining, or non-examining. 20 C.F.R. 416.927(d)(1-2). Second, if the relationship was treating, the Court must determine if the opinion of the physician is "well supported by medically acceptable evidence and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. 416.927(d)(2). Under the treating physician rule, if either condition is not satisfied, the ALJ may decline to give controlling weight to the physician's opinion. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Here, the ALJ addressed the opinions of Drs. Sami and Cajigal as Barnes' "treating physicians." Dr. Sami is described as "a treating professional at Bridgeway" (R. at 432), and the ALJ refers to "treating physician Dr. Cajigal" (R. at 429). Neither party disputes that Dr. Cajigal should be considered a treating physician. The Defendant questions whether Dr. Sami should be considered a treating physician but does not take a firm position on the issue. (R. at 10, n. 3.) If Dr. Sami was not a treating physician, the ALJ would not have been required to give his opinion controlling weight.

Assuming that Dr. Sami and Dr. Cajigal qualify as "treating physicians," the Court must determine whether the ALJ gave proper weight to their opinions. In the default scenario, the medical opinions of a treating physician regarding the nature and severity of an applicant's condition receive controlling weight. 20 C.F.R. §416.927(d)(2); *Skarbek*, 390 F.3d at 503.

7

However, an ALJ need not give controlling weight to the opinion of a treating physician when there is a lack of objective evidence to support the opinion or if the opinion is inconsistent with other record evidence. *Id.* The Court will show deference to an ALJ's decision not to give controlling weight to a treating physician's opinion so long as the ALJ "minimally articulates" the rationale for discounting the opinion. *Id*. In doing so, an ALJ need not address in writing each and every piece of evidence in the record bearing the treating physician's opinion. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

In the present case, the Court finds that the ALJ provided an adequate explanation of her decision not to give controlling weight to Dr. Cajigal's work assessment because it was not supported by objective medical evidence. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ specifically noted that Dr. Cajigal's conclusory statements as to Barnes' ability to stand, sit, or walk, and his likelihood of missing three days of work per month were not linked to any specific objective evidence in the record. Rather, the only objective medical evidence identified in Dr. Cajigal's December 2009 RFC assessment was a "slight tenderness to palpation and pressure" in Barnes' abdomen. (R. at 498.) At the supplemental hearing, the ALJ requested that Barnes have Dr. Cajigal submit additional medical evidence to support his opinion and link the medical evidence to job-related limitations. (R. at 558.) The ALJ cautioned Barnes at the time that she "can't give [Dr. Cajigal's] opinion evidence much weight at all unless he gives [the ALJ] some medical evidence to support it." (R. at 557-58.) Dr. Cajigal's letter of February 15, 2010, sent in response to the ALJ's request, provided some objective medical evidence in support of the diagnoses but did not link the medical evidence to any work-related limitations. (R. at 511-12.) The ALJ explained that, even taking into account the letter of February 15, she could not find that Dr. Cajigal's opinions were linked to objective evidence. (R. at 430.)

To the contrary, Dr. Cajigal's opinions are directly contradicted by other substantial evidence in the record.  In particular, the ALJ noted that Cajigal's assessments of Barnes' ability to stand, sit, and walk are inconsistent with Barnes' activities, such as visiting family, playing slots at a casino, and grocery shopping.  The ALJ also referred to Dr. DeYoung's report in which he stated that he could not detect any evidence of neuropathy and that his review led him to suspect "some degree of somatization." (R. at 191.)  Thus, the ALJ's rejection of Dr. Cajigal's opinion was supported by substantial evidence.

The ALJ also adequately explained her reasons for declining to give controlling weight to Dr. Sami's assessment.  The ALJ concluded that Dr. Sami's conclusions were predicated on subjective statements made by Barnes and lacked supporting objective medical evidence to give the opinion controlling weight.  Indeed, there is no indication that Dr. Sami followed any objective medical evidence in reaching his conclusions.  Conversely, the record contains substantial evidence contradicting Dr. Sami's conclusions.  For example, the State agency's RFC assessment, performed by Dr. Hermsmeyer, found that Barnes was not significantly limited in most areas and that he was capable of carrying out "simple one- and two-step tasks at a consistent pace." (R. at 219.)  This directly refutes Dr. Sami's assessment.  Also, Dr. Ritterhoff, in his treatment notes from 2004 and 2005, indicated that Barnes did not display clear symptoms of depression.  Dr. Sami's conclusion as to Barnes' work limitations, which relied on his assessment of Barnes' mental faculties, is "out of sync" with the assessments of the other doctors and with the objective medical evidence supporting those doctors' assessments.  Consequently, the ALJ's decision not to accord controlling weight to Dr. Sami's work assessment was both reasonable and sufficiently articulated, and the Court finds no reason to overturn that decision.

### B. Credibility of Barnes' Testimony

As officers at a hearing are able to hear and see witnesses, a credibility determination by an ALJ receives "special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Only if the determination of credibility by an ALJ is "patently wrong" will it be reversed. *Id.* "Thus, it is generally understood that a reviewing court does not reconsider credibility determinations made by the ALJ so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (citing *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991)).

Barnes argues that the ALJ erred by determining that his testimony lacked credible. Barnes contends that the ALJ disregarded the testimony of Mrs. Barnes and gave insufficient weight to the testimony regarding his IBS.

The ALJ discounted Barnes' credibility based on substantial contradictory evidence in the record. First, the ALJ noted the ability of Barnes to drive, visit family, shop for groceries, and care for his own personal needs. (R. at 430.) The ALJ found these activities to be inconsistent with Barnes' claim that he is physically unable to perform light work activities. (R. at 430.) Furthermore, Barnes' ability to socialize and perform routine tasks like playing slot machines and maintaining personal hygiene was considered by the ALJ to be inconsistent with the level of impairment that Barnes asserted.

The ALJ also found the observations of the examining physicians material to the determination of Barnes' credibility. For instance, the ALJ concluded that Barnes "is willing to 'appear' to have symptoms greater than objective evidence supports" in order to support his attempts to demonstrate a disability that would entitle him to benefits. (R. at 428.) The ALJ also made specific reference to the evaluation of Dr. Ritterhoff who noted that Barnes expressed somatic complaints with no clear relation to his medical complaints. (*See* R. at 431; R. at 237

(noting that Barnes "continues to somatize and have multiple somatic complaints with no obvious relevance or correlation with his medical diagnoses").)

Barnes further contends that his testimony and that of his wife as to the limitations that his IBS imposes is of particular importance, as it would tend to establish Barnes as unemployable. (Pl.'s Mem. 16.) If true, this would doubtlessly have an impact on whether Barnes was truly disabled under the controlling statutes. However, the mere significance of a fact to a determination of disability is not a sufficient reason to overturn an ALJ's determination of credibility if the ALJ is not patently wrong and if the ALJ's decision is supported by the record. *See Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993). Here, the Court cannot conclude that the ALJ's credibility assessment regarding Barnes and his wife's subjective testimony was patently wrong.

While Barnes does not explicitly state it, he suggests that the ALJ was unduly prejudiced against him in his attempt to obtain benefits. Specifically, Barnes alleges that "the ALJ had no intention of considering the testimony of the claimant's wife" (Pl.'s Mem. at 15), and that the ALJ mischaracterized his testimony or engaged in "intentional truth twisting to accomplish the goal of denying benefits" (Pl.'s Mem. at 16). The Court need not address this point in great detail other than to note the strong presumption that ALJs are generally impartial, and to overcome this presumption it must be shown that the ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Martin v. Astrue*, 345 F. App'x. 197, 202 (7th Cir. 2009) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)). Barnes has given no indication that the ALJ here displayed any conduct that would rise to this level. To the contrary, the ALJ proceeded fairly by allowing Barnes an extra 30 days after the supplemental hearing to provide additional medical information and attempt to fill in the logical

gaps in the record. (R. at 559.) The Court also notes that the ALJ spent significant time at the supplemental hearing asking probing questions to clarify Barnes' testimony. (*See, e.g.*, R. at 522-23 ("You know, I'm still not clear on how much mowing he did in 2009").) The extra effort that the ALJ made to ensure that Barnes' testimony was complete is not consistent with prejudice.

### C. The ALJ's Obligation to Develop the Record

Barnes asserts that the ALJ's determination was flawed because she did not comply with the remand instructions of the Appeals Board. Barnes contends that the ALJ was "specifically Ordered [sic] to more fully develop the record." (Pl.'s Mem. at 17.) Barnes argues that, by declining to obtain additional medical testimony and evaluations, the ALJ failed to meet her obligation to fully develop the record. He further alleges that the ALJ erred by relying on medical evidence dating from 2004 to reject his application.

Regardless of whether a claimant is represented or proceeds *pro se* in a Social Security case, an ALJ is obligated to develop a full and fair record prior to rendering a decision. *See* 20 C.F.R. 416.912(d); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The Court generally defers to the decision of the ALJ on how much evidence to gather. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). Additional medical expert evidence is required "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." 20 CFR 416.919(a)(2)(b).

Barnes specifically contends that the ALJ was ordered by the Appeals Council to "more fully develop the record" and that the ALJ should have ordered further medical evaluation at the expense of the state. (Pl.'s Mem. at 17.) However, this Court is only authorized to review the sufficiency of "any *final* decision of the Commissioner of Social Security." 42 U.S.C §405(g)

(emphasis added). Putting aside the question of whether Barnes correctly characterizes the Appeals Council's instructions, compliance with the order is an internal agency matter and not a final decision of the agency. *Balde v. Astrue*, No. 10-C-0682, 2011 WL 3419371, at *17 (E.D. Wis. Aug. 04, 2011). The Court does not review internal agency proceedings and will not address compliance with the order of the Appeals Council in greater detail. *Id.*

The record concerning Barnes' application contained substantial evidence from medical experts sufficient to justify the ALJ's decision not to order additional medical testing. The opinions of both State agency experts and Barnes' own doctors were considered by the ALJ and addressed upon remand. Barnes had been examined, and evidence was submitted, by Dr. DeYoung, Dr. Cajigal, Dr. Ritterhoff, and doctors at Bridgeway, Inc. Dr. Bilinksy and Dr. Cajigal submitted physical RFC assessments, while Dr. Sami and Dr. Hermsmeyer provided mental RFC assessments. As Barnes notes, "pages and pages of records" from treating physicians were submitted. (Pl.'s Mem. at 14.) The existing evidence in the record was substantial and sufficient to allow the ALJ to come to a reasonable, reviewable conclusion regarding the implications of Barnes' alleged mental impairments.

In cases where an applicant is represented by counsel, the burden rests on the claimant to introduce some objective evidence that the record must be developed further.[1] *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011). Barnes here introduced no such evidence, either through motion or at the supplemental hearing. In fact, there is no indication in the record that Barnes ever requested additional medical examination by the state or suggested that it might be called for at any point prior to the filing of the present application for review by this Court.

---

[1] Even under the more lenient standard of review applied in *pro se* cases, the Court will not find a failure to develop the record unless there was a significant (*i.e.*, material) omission. *See Luna*, 22 F.3d at 692-93.

Regardless, it is clear that the ALJ specifically requested that Barnes' medical source provide supplementary evidence to link any diagnosis with supporting objective medical evidence, a request with which Dr. Cajigal complied.  The ALJ made an effort to probe Barnes' recent medical history and ongoing health problems by asking questions about his day-to-day activities and symptoms.  *See Martin v. Astrue*, 345 F. App'x 197, 202 (7th Cir. 2009).  By doing so, the ALJ satisfied her obligation to fully develop the record before rendering a decision.

## V.  CONCLUSION

The Court finds that the ALJ's decision to deny Barnes' application is supported by substantial evidence and devoid of legal error.  Accordingly, the Court AFFIRMS the ALJ's decision denying the Barnes' application for SSI.

Entered this 1st day of August, 2012.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
